ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY *v.* EVANS.

Opinion delivered April 24, 1911.

1. EVIDENCE—PREPONDERANCE.—In determining the preponderance of the evidence the jury may consider the number of the witnesses. (Page 76.)

2. INSTRUCTION—PREPONDERANCE OF EVIDENCE.—The court in a civil case instructed the jury that "the preponderance of evidence does not mean the greater number of witnesses, but it means the evidence that appears to you as most probably true, and which, after a careful consideration of all the facts and circumstances in the case, appears to you of greater weight than the evidence offered on the other side." *Held* not objectionable, in view of other instructions to the effect that the jury should not arbitrarily disregard the testimony of any witness. (Page 76.)

3. CARRIERS—RELATION OF PASSENGER—INSTRUCTION.—In an action for the death of an alleged passenger, where there was evidence that deceased came into a coach having in his hat a check similar to that given to other passengers, it was not error to submit to the jury the question whether he was a passenger. (Page 77.)

4. SAME—CONTRIBUTORY NEGLIGENCE—EMERGENCY.—In an action against a railway company for the negligent killing of a passenger it was

not error to instruct the jury, in effect, that if the decedent was negligently placed in a position of danger, and was injured in attempting to escape therefrom, the carrier was liable if deceased used such care as a prudent man would have used under the same circumstances. (Page 78.)

5. EVIDENCE—EXPECTANCY OF LIFE.—A person's expectancy of life may be proved, not only by the mortuary tables, but also by showing the person's age, health, habits and other facts which affect its probable continuance. (Page 80.)

6. CARRIERS—PASSENGER RIDING ON PLATFORM.—It was error to refuse to instruct the jury, in a suit against a carrier for the negligent killing of a passenger, to the effect that if the deceased passenger was riding on the platform at the time he was killed the verdict should be for the defendant; but such error was not prejudicial where the law was properly declared in another instruction. (Page 80.)

7. SAME—CONTRIBUTORY NEGLIGENCE—WHITE PASSENGER IN COLORED COACH.—It was not error, in an action against a carrier for negligently killing a white passenger, to refuse to charge the jury to find for defendant if the deceased passenger was in the colored coach, a place not provided for the use of white passengers, as the statutory provisions for the segregation of the races have no reference to the safety of the passengers. (Page 81.)

8. SAME—DERAILMENT OF COACH—EVIDENCE.—In an action against a carrier for negligently killing plaintiff's intestate in the derailment of a coach in which he was riding, it was competent to prove that the flanges of the engine's wheels had become much worn. (Page 85.)

9. TRIAL—IMPROPER STATEMENT.—Where, in an action against a railroad company for the killing of a passenger, defendant's counsel asked a witness, "Did you ever know any one in your life, who is now dead?" to which he answered, "Yes, sir," a remark by plaintiff's counsel, "I guess he knows lots of people the Iron Mountain has killed," was not a statement of fact, but a bit of railery, and not misleading. (Page 83.)

Appeal from Saline Circuit Court; *W. H. Evans,* Judge; affirmed.

### STATEMENT BY THE COURT.

Mrs. Mattie Evans as administratrix of the estate of her deceased son, Steve Evans, brought suit against the St. Louis, Iron Mountain & Southern Railway Company to recover damages for the benefit of the estate and next of kin for the death of Steve Evans, which was caused by the wreck of the passenger train of the defendant company. Steve Evans resided with his mother in Pine Bluff, Arkansas, and was 22 years old at the

time of his death.   On the 18th day of September, 1909, he left
home about 11 o'clock P. M. to take the early train for Little
Rock to spend the day with a friend.   On Sunday night about
9:40 o'clock on September 19, 1909, defendant's passenger train
*en route* from Little Rock to Pine Bluff was wrecked about one
and a half miles south of Farrell station.   The train was com-
posed of the engine, tender, combination baggage and mail car,
combination negro coach and white smoker, day coach and sleep-
ing car.   There was an embankment six or eight feet high where
the wreck occurred.   The engine and tender, the mail and bag-
gage coach and the combination negro compartment and white
smoker were derailed, and turned over.   The day car was partly
derailed, but remained upright.   Steve Evans was found after
the wreck, lying at the foot of the embankment severely injured,
and died next day as a result of his injuries.

James Walker and G. W. Bell, both negroes, testified that
they were passengers on the train at the time it was derailed,
and were occupying seats in the negro compartment.   They occu-
pied separate seats; Walker was riding with his back to the engine
and Bell sat with his face toward it.   Both say that just before
the wreck occurred  a young white man came into the coach and
walked to the water cooler, which was at the front end of the
car on the right of the door, and got a drink of water.   They
say that their attention was specially directed to him because he
was white, and it was unusual for white persons to come into the
coach where colored persons were riding.   Walker says that
after the man got a drink of water he lighted a cigarette, but he
does not know where he was just as the wreck occurred.   Bell
says that it was from three to five minutes from the time he saw
the young man go to the water cooler until the train was de-
railed.   He states that while the young man was at the water
cooler, some one called out there was going to be a wreck, and
he began to look to his own safety, and did not see the young
man any more until after the wreck.   The deceased, Steve Evans,
was found at the foot of the embankment near the front end of
the negro coach, and both Walker and Bell saw him and recog-
nized him as the young man they had seen enter the negro coach
and go to the water cooler just before the wreck.   They both
lived at Pine Bluff and say that the young man had a check in

his hat just like the one they had.   These checks are given passengers when they pay their fares.   Walker says that if one had walked out of the negro compartment on the front platform of the car and had been turned squarely to the right and gone down the embankment, he would have come to where Evans was found. Bell says he was five or six feet further forward, and some of the defendant's witnesses place him as from ten feet in front of a line drawn at right angles to the front steps of the negro coach.

Bell, who was a physician, testifies that Evans was groaning when he saw him after the wreck, and that this indicates consciousness.   On the next morning his mother saw him, and she testified that he recognized her, and that he appeared to be conscious.   On the other hand, the physicians who attended him were introduced by the defendant, and testified that he was unconscious.

The plaintiff also adduced evidence tending to show that decedent was 22 years of age, lived with her and gave her nearly all of his earnings.   That he had always done so, and expected to remain with her and help support her.   That he was a boiler maker and a young man of good habits and a steady worker. That he was robust and in good health when he was killed. That plaintiff herself was in good health.

Other evidence adduced by plaintiff showed that the train was running very rapidly when it was derailed.   That the track was torn up for a considerable distance by the train.   That the ties were broken and showed that they were rotten.   That there were low points in the rails, and that the flanges on the wheels of the engine were worn, and that this was likely to cause the engine to be derailed.   That there was a curve in the track where the derailment occurred.

On the other hand, the evidence for the defendant tended to show that the track at that point was straight and in good condition, that the flanges on the engine wheels were not worn, and that the train was only running at a speed of from 25 to 30 miles an hour when the derailment occurred.   The train auditor and porter were in the car for colored passengers when the wreck occurred, according to their testimony.   They both say that no white man was in the car, and no one ran out of the front door when the wreck occurred.   The porter says he was standing

with his back against the door, and no one could have gone out at it. They say they had been out on the platform just before the auditor began taking up fares and requested all persons there to come inside the car. The auditor does not remember taking up the fare of the decedent nor does he remember whether or not he was a passenger on the train. Both he and the negro porter, however, testify positively that he was not in the negro coach when the wreck occurred. The engineer had orders to run slow at the place where the wreck occurred.

Other evidence will be stated or referred to in the opinion.

There was a verdict for the plaintiff, and defendant has duly prosecuted an appeal to this court.

*W. E. Hemingway, E. B. Kinsworthy, H. S. Powell* and *James H. Stevenson,* for appellant.

1. The court erred in admitting evidence of repairs to the engine wheels after the accident. Such evidence was inadmissible, regardless of whether the repairs were made necessary by the conditions existing previous to the accident or by damages by reason of the accident. 78 Ark. 147; 70 Ark. 179, 182; 30 Minn. 468; 89 Ark. 556; 8 Enc. of Ev. 914; 82 Ark. 555.

2. On cross-examination of the witness Hammett, the appellant's attorney, asked him if he ever knew any one who is now dead, and he responded that he had. Thereupon appellee's attorney said, in the presence and hearing of the jury: "I guess he knows lots of people the Iron Mountain killed." This remark was improper. Its tendency and necessary purpose was to prejudice the minds of the jury against appellant and its cause. It was uncalled for, totally outside the evidence, and should have been met by a reprimand. By overruling appellant's objection, the court gave its implied sanction to the remark. 62 Ark. 126; *Id.* 516; 71 Ark. 415; 70 Ark. 305; 65 Ark. 619; 71 Ark. 427; 63 Ark. 174; 74 Ark. 210; 77 Ark. 238.

3. The court's instruction 4 is erroneous, especially in the use of the phrase "and has no reference to the number of the witnesses." It is true the number of the witnesses is not the controlling factor in weighing evidence which is conflicting; but it is also true that it is a factor which should be regarded for whatever it may be worth in the minds of the jury. 179 Ill. 492, 53 N. E. 1008.

4. The court erred in giving the fifth instruction over appellant's specific objections thereto. Kirby's Dig. § § 6622 et seq.; 6627, 6628, 6629.

5. The seventh instruction is erroneous because (1) there is no evidence which warrants the hypothesis that the deceased, through fear or apprehension of danger, and in an attempt to escape danger created by the negligence of appellant, attempted to jump off the train. This part of the instruction is too highly argumentative to be a fair instruction, and has the force of an expression of opinion by the court. (2) There is no evidence on which to base that part of the instruction wherein the court attempts to state the test of contributory negligence under such circumstances of emergency, etc.

5. The sixth instruction is erroneous. There is no evidence in the record of the life expectancy of Mrs. Evans.

6. As a matter of fairness, appellant was as much entitled to have its theory of the case given to the jury as was the appellee. The court therefore erred in refusing the fifth instruction requested by appellant.

7. Appellant's requested instruction 14 should have been given. Where there are ample accommodations in a train of which a passenger does not choose to avail himself, but for his own gratification or through curiosity, etc., he goes into a part of the train where, under the circumstances, he has no business to be, and he is injured while there, and could have avoided injury by staying where he belonged, he cannot recover for the injury. 46 Ark. 528, 535, 536; 67 Ark. 545; 4 Elliott on Railroads, § 1630, § 1630a; 162 Fed. 665; 3 Hutchinson on Carriers, 1197, 1192; 3 Thomp. Com. on Law of Negligence, 2947; Beach on Contributory Negligence, 149; 117 Fed. 127, 54 C. C. A. 1; 71 Ark. 590; 193 Mass. 453, 455, 79 N. E. 775; 146 Mass. 605, 16 N. E. 466; 12 S. C. 336; 81 Me. 84; 90 Ala. 64; 84 Miss. 502; 156 N. Y. 224; 47 La. Ann. 1671.

8. The verdict is contrary to, and is not sustained by, the evidence or any of it.

*T. M. Mehaffy, W. T. Young* and *A. H. Rowell,* for appellee.

1. Appellant's suggestion of error in admitting evidence of repairs to the engine wheels after the accident is not well taken. The inquiry was directed toward proving the condition

of the equipment at the time of the accident. Counsel for appellee stated to the jury that he did not want them to consider any testimony at all with reference to repairs to any part of the train or equipment where the repairs were made necessary by the accident. Moreover, the court specifically instructed them not to consider the work done on the flanges and wheels of the locomotive. Since this testimony came out incidentally in the effort to show the condition of the equipment at the time of the wreck, there was no error. 82 Ark. 561; 89 Ark. 562; 89 Ark. 327, 331; 87 S. W. 71.

2. The remark of counsel, of which appellant now complains, could not have prejudiced appellant in the minds of the jury. It was a mere passing light remark, and invited by the question of appellant's attorney to the witness on cross-examination. 93 Ark. 600; 71 Ark. 427.

3. There is no error in the fourth instruction. It is not prejudicial to instruct the jury that the weight of evidence has no reference to the number of witnesses. Moreover, in other instructions, given at the request of both appellant and appellee, it was made plain to the jury that were to decide the questions presented by a preponderance of the evidence, and to consider all of the evidence and all of the circumstances introduced into the case. If the instruction was objectionable in the particular now urged, it was appellant's duty to request an instruction to cure the defect. 72 N. E. 574; 30 N. E. 313. See, supporting the instruction, 41 Am. Rep. 19; 37 Ark. 580; 179 Penn. 47.

4. There was ample testimony to warrant the giving of instruction 5, and it was correct as given.

5. There is no error in the seventh instruction. 55 Ark. 248; 4 Elliott on Railroads, (2 ed.) § 1642.

6. It is not necessary to introduce tables of expectancy in order that a jury may determine the probable expectancy of life of a particular person, but the jury may find such expectancy from other evidence. 76 Ark. 233.

7. The fifth instruction requested by appellant seeks to have the court declare as a matter of law that if deceased was any where else than within the coach plaintiff could not recover, and was properly refused.

8. Appellee's requested instruction 14 was properly re-

fused because it tells the jury as a matter of law that deceased's going into the coach, for no matter what purpose, deprived plaintiff of the right to recover. All the cases cited by appellant show some negligent act of the injured party. None is shown here. It is not negligence for a passenger to pass from one car to another in a vestibule train. He is held only to the exercise of ordinary care and prudence. 92 Ark. 432. See also 24 S. E. 833; 100 S. W. 177; 90 Ark. 23.

Hart, J., (after stating the facts): Counsel for defendant assign as error the action of the court in giving the following instruction:

"4. You are instructed that the preponderance of evidence does not mean the greater number of witnesses, but it means the evidence that appears to you as most probably true and which, after a careful consideration of all the facts and circumstances in the case, appears to you of greater weight than the evidence offered on the other side, that is, the evidence which preponderates and has no reference to the number of witnesses."

We do not think the defendant was prejudiced by this instruction, when read in the light of the evidence and in connection with the other instructions on the same subject. The evidence is to be weighed by the jury, and in determining on which side the greater weight of the evidence is the jury may of course consider the element of numbers. In other instructions the court told the jury that the preponderance of the evidence meant the greater weight of evidence. That the jury was the sole judges of the weight of the evidence and the credibility of the witnesses. That in passing on the weight to be given to the testimony of any witness the jury should take into consideration any bias or prejudice that may be shown, the interest of any witnesses, if shown, the reasonableness or unreasonableness of his statements, any conflicts or contradictions that might appear in his testimony, when considered alone or as compared with other evidence adduced at the trial. The jury was also told to carefully consider all the facts and circumstances detailed in evidence by the witnesses and the manner and conduct of the witnesses while testifying.

The court further said: "You are told that you can not arbitrarily disregard the testimony of any witness, whether intro-

duced on behalf of the plaintiff or the defendant, but that it will be your duty to give to the testimony of all witnesses who have testified before you, whether introduced on behalf of the plaintiff or the defendant, the same care and consideration in arriving at your verdict."

The court specifically told the jury that the instructions should be considered together, and repeatedly instructed them to consider all the evidence in weighing it, and that they must not arbitrarily disregard the testimony of any witness. Hence we hold that the defect in the instruction was cured by other instructions on the same point, given by the court on its motion and at the request of the defendant. These additional instructions show plainly that the court did not mean to tell the jury that they could not consider the element of the number of witnesses in weighing the evidence, and we do not think that the jury so understood the instructions, when read together.

In the case of *Railway Co.* v. *Johnson*, 59 Ark. at p. 129, the court, in discussing a somewhat similar assignment of error, said: "The charge of the court in the first part of the fourth instruction was not correct in that it permitted the jury, in weighing the evidence, to regard the mere personnel of witnesses, rather than the subject-matter of their testimony, when both should be considered. But whatever defect there was in this particular was cured by the second prayer, given at the instance of appellant, in which the court told the jury 'that they must not discredit any witness arbitrarily, nor discard or depreciate the testimony of witnesses merely because they were in the employ of the defendant.'"

2. Counsel for defendant insist that the court erred in giving the following instruction:

"5. If you find from the evidence in this case that Steve Evans was a passenger on defendant's train on the 19th day of September, 1909; that going to the place where water was kept, or to the water closet, even while the train was going at a rapid rate of speed, was not of itself negligence; and if there was no water in the coach in which he was riding, he would have the right to go from one coach to the other for the purpose of getting water, or to go from the white end of the combination car to the other end for the purpose of getting water, and he

would not necessarily be guilty of negligence in doing so, but he would have a right to go there and to stand there while drinking his water; provided the standing was not so protracted or uncalled for that it became unnecessary or imprudent."

They contend that there is no testimony upon which to predicate it. We do not agree with them. The theory of the defendant is that Steve Evans was not a passenger, and that he was riding on the blind baggage or some other part of the train where passengers were not allowed to ride, when the train was wrecked. On the other hand, plaintiff contends that Steve Evans was a passenger, and that he went from the coach in which he was riding into the compartment for colored persons for the purpose of getting a drink of water. He had a right to leave his seat for the purpose of getting a drink of water, and it did not make any difference whether he went for it to the end of the car set apart for colored passengers or obtained it in the end set apart for white passengers. There could be no more danger in going to one end of the coach than the other. Separate compartments for white and colored persons are required by the statutes for the segregation of the races, and not for the safety of the passengers.

The defendant's witnesses composing the train crew testified that they did not remember whether or not Steve Evans was a passenger on the train the day it was wrecked.

Plaintiff adduced evidence tending to show that Steve Evans came into the negro coach and went straight to the water cooler and began drinking water; that he lived at Pine Bluff and had in his hat a check similar to those given other passengers for Pine Bluff; that the train was in motion when he entered the negro compartment. From these facts and circumstances, the jury might have found that he was a passenger and that he came into the negro compartment to get a drink of water.

3. Counsel for defendant assign as error the action of the court in giving the following instruction:

"7. If you find from the evidence in this case that the deceased, Steve Evans, was a passenger on defendant's train, and that the train was wrecked or derailed, then the mere fact that the deceased, through fear or apprehension of danger, did an act which was the immediate cause of injury to himself does

not, of itself, amount to negligence; if the negligence of the defendant put the deceased in peril, and in attempting to escape that peril he did an act, also dangerous, from which injury resulted to him, such act would not necessarily be an act of contributory negligence, such as would prevent a recovery for such injury. The test of contributory negligence under such circumstances is, was his attempt to escape, if you believe he made an attempt to escape, an unreasonable or rash act, or was it an act that a person of ordinary prudence might do under like existing circumstances? And it is not to be determined by the result of the attempt to escape, or by the result that would have followed had the attempt not been made. . If you should find from the evidence that the deceased, by the negligent wrecking of the train, was placed by the defendant in a position of danger, while in the car of the defendant, then the deceased would have the right to judge of the danger in remaining in said car and also the dangers in attempting to escape, from the circumstances as they appeared to him at the time and not by the result; and if he, in making such attempt to escape, used such care as a prudent man, under such circumstances should have used, and in doing so received an injury, your verdict should be for the plaintiff."

Just before the train was wrecked the evidence shows that several jolts were felt. The train auditor himself says: "The first thing I noticed was a jerk and a jar, then a jump, and the cars were going over the crossties, and they turned over. The passengers fell the way it turned, and there was a sudden jolt, and it stopped altogether." The negro car fell over towards the right, and Evans was found lying at the foot of the embankment on the right side opposite the front part of the negro coach. Evans was a boiler maker and worked in the railroad shops at Pine Bluff. Presumably, he was familiar with the movement and operation of trains. It is the theory of plaintiff that when he felt the first jar he ran out on the front platform and was thrown from there by the derailment of the train. An instruction similar to this was approved in the case of *Railway Company* v. *Murray,* 55 Ark. 248, and we think the facts and circumstances adduced in evidence by the plaintiff were sufficient to warrant the court in giving the instruction.

4. Counsel for defendant contend that there was error in giving the following instruction:

"6. If you find for the plaintiff for the benefit of the next of kin, your verdict will be for such a sum of money as will be a just and fair compensation to the mother by reason of the death of the deceased; and you are to arrive at this by taking what the proof shows that deceased would have contributed to his mother during her expectancy and the present worth of this sum would be the amount of your verdict. If you find for the plaintiff, and if you believe from the evidence that deceased, Steve Evans, suffered any conscious pain from the injury received, then you will find for the plaintiff, for the benefit of the estate of the deceased, in whatever sum you believe from the evidence, in your sound discretion and judgment, plaintiff is entitled to recover for pain and suffering."

The chief objection of counsel to this instruction is that no effort was made to prove the expectancy of life of Mrs. Mattie E. Evans by the introduction of mortuary tables; but life tables are not the only way of proving the probable duration of life. The jury may determine the probable duration of life from the age, health, habits, and other facts which affect its probable continuance. *Kansas City So. Ry. Co.* v. *Morris,* 80 Ark. 528; *St. Louis, I. M. & S. Ry. Co.* v. *Glossup,* 88 Ark. 225. Here the testimony showed that the mother was 46 and the son was 22; that both were in good health and of good habits; that the son, although of legal age, gave most of his earnings to his mother, and from this and other circumstances adduced in evidence the jury might have inferred that he would continue to do so. While the testimony of the defendant tends to show that Steve Evans was unconscious from the time he was injured until he died, the testimony of the plaintiff shows that he was conscious. His mother says he was conscious the next morning, and Bell states that he appeared to be conscious that night after the injury. We hold that there was evidence sufficient to warrant this instruction.

5. Counsel for defendant next complain that the court erred in refusing its fifth instruction, which is as follows:

"5. The jury are instructed that, although they may find that the deceased was a passenger on defendant's train at the

time of the wreck, yet if you believe from a preponderance of the evidence that at said time he was standing or sitting upon the platform of any of the coaches of said train, or that he was on any part of said train other than on the inside of the coaches, where provision was made for passengers to ride, then your verdict will be for the defendant."

The court, however, did give the following instruction at the request of defendant:

"6. You are instructed that, although you may find from the evidence that deceased at the time of the wreck was a passenger on defendant's train, yet, if you believe from a preponderance of the evidence, taking into your consideration all the facts and circumstances detailed by the witnesses, that at the time of the wreck deceased was occupying any other part of the train than that provided by the defendant for the use of passengers, and that by reason thereof he was thrown from the train and received the injury complained of, then your verdict will be for the defendant."

It is well settled that each side has the right to have its theory of the case presented to the jury, and no citation of authorities is necessary on that point. We think the court should have given the fifth instruction because it presented defendant's theory of the case in a little more concrete form than the sixth instruction. We do not think, however, there was prejudicial error in refusing it; for the matters embraced in it were substantially covered by the sixth instruction.

6. There was no error in refusing defendant's fourteenth requested instruction, which is as follows:

"14. The jury are instructed that, although they may find that at the time of the wreck deceased was a passenger on defendant's train, yet, if you believe by a preponderance of the evidence that at the time of the wreck he was in the colored coach, a place not provided for the use of white passengers, and where, under the rules of the defendant company, he had no right to be, and you further find that he would not have received the injuries complained of had he been riding in that part of the coaches provided for the transportation of white passengers, then your verdict will be for the defendant."

The provisions of our statutes and the rules of the company

based on them in regard to separate coaches for white and colored persons are for the segregation of the races, and have no reference to the safety of the passengers. On the other hand, rules of the company requiring passengers to ride in coaches and not on the platforms or other portions of the train obviously dangerous are for the protection of the passengers; and usually where the passengers wilfully violate these rules promulgated for their safety, they are deemed guilty of contributory negligence. It is evident that the fact of whether Steve Evans was in the end of the coach provided for white passengers or that provided for colored passengers could in no way be said to be a factor in causing his injury and death.

7. We now come to the question of the sufficiency of the evidence to support the verdict. Counsel for defendant earnestly insist on a reversal of the judgment upon this ground.

In determining this question, we must remember that the jury were the judges of the weight of the evidence, and, the verdict being for the plaintiff, the evidence adduced by her must be given its greatest probative force. Walker and Bell both place Steve Evans at the water cooler just at the right of the front door in the negro compartment previous to the wreck. They say he came in there, while the train was running, with a check in his hat similar to that possessed by other passengers for Pine Bluff. It was shown that Steve Evans resided there, and had gone to Little Rock on the early morning train with the intention of returning home that night. He had sufficient money when he left to bear his expenses to Little Rock and return. Hence, if the testimony of Walker and Bell is to be believed, it may be taken as established that Steve Evans was a passenger and was in the negro compartment of the coach at the water cooler, drinking water, just before the wreck. Bell says he saw him standing there when the first jar was felt. That he then turned his head away and began looking to his own safety. It is not improbable, then, that Evans when he first felt the jar sprung through the door with the intention of being on the platform where he could jump if he thought that the safer course, and that he was thrown from there to the place where he was found. Walker testifies that Evans was found on a line at right angles to the front steps of the negro coach. The

other witnesses place it further forward, and the train auditor and porter testify positively that Evans was not in the negro coach when the train began to leave the track. The jury settled this conflict in the evidence in favor of the plaintiff. Counsel for defendant insist that the physical facts show that the verdict is not supported by any substantial evidence. By which they mean that, assuming all the matters testified to by plaintiff's witnesses to be true, Evans could not have been lying where he was found. We do not agree with them. If Evans ran out of the front door of the negro coach when he first felt the train begin to leave the track, it is possible, if not probable, that he would have been thrown just where Walker says he was found. The jury had a right to base their verdict, not only upon facts known and seen by witnesses, but also upon such inferences as reasonable minds might deduce from these facts and circumstances.

8. It is urged by counsel for defendant that the court erred in admitting evidence of repairs to the engine wheels after the accident. The record shows that plaintiff was permitted to show that one of the probable causes of the wreck was that the flanges on the wheels of the engine had become too much worn. Testimony was introduced tending to show the condition of the equipment at the time of the wreck, but all testimony tending to show that any repairs were made necessary by the wreck was expressly withdrawn from the consideration. That it was proper to show the condition of the flanges at the time of the wreck, see *St. Louis, I. M. & S. Ry. Co.* v. *Freeman,* 89 Ark. 327; *Bodcaw Lumber Co.* v. *Ford,* 82 Ark. 555.

9. It is insisted that the judgment should be reversed on account of improper remarks made by counsel for plaintiff during the taking of the testimony before the jury. The remarks complained of were made under the following circumstances: Counsel for plaintiff introduced a witness by whom they thought they could prove that Steve Evans was a passenger on the train the day of the wreck. It turned out that the evidence of the witness was hearsay, and all of it was excluded from the jury except his statement that a supposed companion of Steve Evans on that day was dead, and on cross-examination counsel for defendant asked him: "Did you ever know any one in your life who is now dead?" and upon his answering, "Yes, sir," coun-

sel for plaintiff said: "I guess he knows lots of people the Iron Mountain has killed." We do not think the remark was intended as a statement of a fact to the jury to influence them in arriving at a verdict, nor that it was so considered by them. The jury is presumed to have been composed of men of ordinary experience in the affairs of life, and doubtless knew that men are frequently killed by trains, and also knew that the remarks were not intended otherwise than as playful raillery.

The judgment will be affirmed.